# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 51
IKB International, S.A., &c., et
al.,
      Respondents,
    v.
Wells Fargo Bank, N.A., &c., et
al.,
      Appellants,
ABFC 2006-OPT1 Trust, et al.,
    Nominal Defendants.
(And Three Other Actions.)

Matthew D. Ingber, for appellants.
John J.D. McFerrin-Clancy, for respondents.
American Bankers Association, amicus curiae.

GARCIA, J.:

Plaintiffs, commercial banks incorporated in Germany, are investors in residential mortgage-backed securities issued by securitization trusts for which defendants served as Trustees. After the securities lost much of their value in the 2008 financial crisis, plaintiffs commenced these actions alleging that defendants breached numerous contractual, fiduciary, and statutory duties, causing plaintiffs' investments to become "essentially

- 1 -

worthless."  While we agree with the courts below that compliance with the "no action

clause" in the governing agreements was not required prior to suit, we decline to recognize

an implied contractual duty on the part of the Trustee to enforce the repurchase protocol

obligations of other parties.  In addition, plaintiffs' duplicative tort and contract claims

must be dismissed.  We modify the order of the Appellate Division accordingly.

I.

We have discussed the history and operation of residential mortgage-backed

securities (RMBS) and the securitization process at length in prior opinions (*see*

*generally Matter of Part 60 Put-Back Litig.*, 36 NY3d 342 [2020]; *U.S. Bank N.A. v DLJ*

*Mtge. Cap., Inc.*, 33 NY3d 84 [2019]; *Deutsche Bank Natl. Tr. Co. v Barclays Bank PLC*,

34 NY3d 327 [2019]; *Ambac Assur. Corp. v Countrywide Home Loans, Inc.*, 31 NY3d

569 [2018]; *Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Cap.,*

*Inc.*, 30 NY3d 572 [2017]; *ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v*

*DB Structured Prods., Inc.*, 25 NY3d 581 [2015]).  To summarize, RMBS are financial

instruments, popular in the mid-2000s, backed by individual mortgage loans (*Ambac*, 31

NY3d at 575; *Nomura*, 30 NY3d at 577-578; *ACE*, 25 NY3d at 589-590).  The

securitization process involves a "sponsor" who acquires a bundle of loans from banking

institutions ("originators") and sells the pooled loans to a "depositor," who places the

loans into a trust (*Deutsche Bank*, 34 NY3d at 331; *Nomura*, 30 NY3d at 577-578).  The

trust issues certificates purchased by investors, who are entitled to a portion of the

revenue stream from the borrowers' payments (*Deutsche Bank*, 34 NY3d at 331;

*Nomura*, 30 NY3d at 577-578).  The mortgage loans in the trust are serviced by a

"servicer," a party typically affiliated with the sponsor or originator. Each trust has a Trustee which acts on behalf of the Trust and whose responsibilities are prescribed by the securitization trusts' governing agreements. While our previous RMBS cases have been brought by RMBS trustees, investors, or their insurers against RMBS sponsors, depositors, servicers, and originators (collectively, obligated parties) to recover for losses on the certificates, here the investors are suing the RMBS Trustees.

While the courts below addressed numerous disputed issues in resolving defendants' motion to dismiss plaintiffs' complaint, the parties have narrowed the questions on appeal before us following the Appellate Division's modification of Supreme Court's order below (*see IKB Intl., S.A. v LaSalle Bank N.A.*, 2021 NY Slip Op 30265 [U], 2021 WL 358318 [Sup Ct, NY County 2021]; *IKB Intl., SA v Wells Fargo N.A.*, 208 AD3d 423 [1st Dept 2022]; 2022 NY Slip Op 74224[U] [1st Dept 2022] [Appellate Division granting leave to appeal and certifying question to this Court]). The following issues remain: whether plaintiffs' suit is barred for noncompliance with the governing agreements' "no-action clauses;" whether, for 25 of the Trusts, plaintiffs' claims that defendants breached the governing agreements by failing to enforce the pre-event of default (EOD) repurchase obligations of the obligated parties must be dismissed because those governing agreements do not impose an enforcement duty on the Trustee; and whether plaintiffs' remaining tort claims are duplicative of their breach of contract claims.

II.

Standard no-action clauses in trust agreements provide "that a shareholder must satisfy certain requirements before bringing a lawsuit on behalf of the shareholders, including giving a trustee an opportunity to bring a lawsuit on behalf of the trust" (*SC Note Acquisitions, LLC v Wells Fargo Bank, N.A.*, 934 F Supp 2d 516, 531 [SD NY 2013]). The specific clause at issue is found in section 10.08 of the governing agreements and provides that

> "No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as herein provided, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee to institute such action, suit or proceeding . . . ."[1]

Supreme Court rejected defendants' argument that the action was barred because plaintiffs did not comply with the notice and demand requirements of the no-action clauses, holding that compliance was excused " 'because it would be futile to demand that the trustee commence an action against itself for breaches of the [governing agreements']' " and that " '[o]nce performance of the demand requirement in the no-action clause is excused, performance of the entire provision is excused, including the requirement that demand be made by 25% of the certificate holders' " (2021 WL 358318, at *4-5, quoting *Blackrock Balanced Cap. Portfolio [FI] v U.S. Bank N.A.*, 165 AD3d

---

[1] Because the numerous governing agreements and complaints involved in this litigation are materially similar, the parties have referred to one representative governing agreement and complaint. The Court adopts this practice as well.

526, 528 [1st Dept 2018]).  The Appellate Division affirmed (208 AD3d at 424).  We

agree that compliance with the no-action clause was unnecessary here.

As we have previously noted, in dicta, "claims against the trustee . . . cannot be

prohibited by a no-action clause" (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 23

NY3d 549, 566 [2014]).  "Because a standard no-action clause vests in the trustee all of

the securityholders' rights to bring suit, making the trustee the only path to a remedy,

courts have been unwilling to enforce such clauses when the trustee's conflicts or

irrationality bar that path to relief" (*Akanthos Capital Mgmt. v CompuCredit Holdings

Corp.*, 677 F3d 1286, 1294-1295 [11th Cir 2012] [reviewing New York law]).  A request

by plaintiffs that the Trustee sue itself would have been futile, because, as defendants

have acknowledged, the Trustee cannot not sue itself, and therefore compliance was not

required.

Defendants attempt to parse the language of the clause and read the request by

holders of at least 25 percent of the voting rights as a distinct, and enforceable, condition.

We reject that contention.  The 25 percent approval requirement is inextricably

intertwined with the initial notice requirement, as well as with the trustee's status as

"interested."  Once a certificateholder is absolved of the requirement to provide written

notice to the Trustee, separately maintaining the requirement that additional

certificateholders make an equally futile demand for suit is illogical (*see Blackrock Core

Bond Portfolio v U.S. Bank N.A.*, 165 F Supp 3d 80, 96 [SD NY 2016] ["There is no

principle of contract interpretation that allows the 25% as used here to be divorced from

the act of demand"]). Accordingly, failure to comply with the no-action clause does not bar suit against the Trustee.

III.

Defendants moved to dismiss plaintiffs' claims that they breached the governing agreements by failing to enforce repurchase obligations, arguing that these agreements do not impose such a duty on trustees. Supreme Court denied this aspect of defendants' motion and the Appellate Division affirmed (208 AD3d at 425-429). We agree with defendants and hold that the governing agreements do not impose on defendants an affirmative duty to enforce repurchase obligations and so those claims should be dismissed.

We have long held that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (*Nomura*, 30 NY3d at 581 [internal citation and quotation marks omitted]). A trustee is required to do only what the governing agreements prescribe. Before an EOD has occurred,[2] RMBS Trustees' "rights and duties [are] defined . . . exclusively by the terms of the agreement" (*AG Cap. Funding Partners, L.P. v State St. Bank & Tr. Co.*, 11 NY3d 146, 156-157 [2008] [internal citation and quotation marks omitted]). A pre-EOD Trustee's role is essentially ministerial; a Trustee has only a duty to avoid conflicts of

---

[2] Plaintiffs' claims regarding the Trustee's duty to enforce repurchase rights are pre-EOD claims.

interest and a duty to perform ministerial tasks with due care, in addition to any express duties provided by the governing agreements (*id.*).

The governing agreements here make clear this circumscribed scope of duties. Article 8 of the governing agreements states that the Trustee "shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement," that "the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement," that "the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this agreement," that "no implied covenants or obligations shall be read into this Agreement against the Trustee," and that "the rights of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty."

As is common in RMBS agreements, the governing agreements here contain a repurchase protocol that provides that the obligated parties (typically, the Sponsor) have a duty to either cure, substitute, or repurchase loans that contain document defects or breaches of representations and warranties (*see e.g. Ambac*, 31 NY3d at 581-582 [holding that repurchase protocol is the sole remedy for defective loans]; *Nomura*, 30 NY3d at 584 [same]). Sections 2.02 and 2.03 of the governing agreements provide that, when a document defect or breach of representations and warranties in a loan is discovered, the obligated party must first attempt to cure the defect or breach and, if the defect or breach cannot be cured, the obligated party must then remove the loan and either substitute a complying loan in its place or repurchase the loan. The governing agreements for the 25 trusts at issue here do not specify which party is to enforce this repurchase protocol.

Section 2.06 of the governing agreements, titled "Execution and Delivery of Certificates," provides in part that "[t]he Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement according to its terms." Because the repurchase protocol of sections 2.02 and 2.03 is located "above" section 2.06, plaintiffs argue that the language in section 2.06 that "the Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of" certificateholders incorporates the repurchase protocol and imposes an affirmative duty on the Trustee to enforce the protocol, and that by failing to do so the Trustee breached the agreements.

Supreme Court credited this argument, holding that Section 2.06 obligates the Trustee to enforce the repurchase protocol and reasoning that "[i]t is undisputed that repurchase rights are among the rights of the Trusts" and the "silence of the Governing Agreements as to the particular party that is to enforce this specific remedy on behalf of the Trusts does not relieve the Trustees of their obligation to enforce remedies pursuant to the broader charge of the Governing Agreements" (2021 WL 358318, at *11). The Appellate Division majority agreed, holding that Supreme Court correctly found an affirmative duty on the part of the Trustee to enforce the repurchase obligations of other parties because the relevant language "imposed an express duty on the trustees to enforce the repurchase protocol for the benefit of investors" (208 AD3d at 425). The dissenting Justices disagreed with the majority's holding "creat[ing] an affirmative duty not found in the agreements" and would have held that "the agreements do not state that the trustee is

under a . . . [pre-EOD] affirmative duty to enforce the seller's repurchase obligations" (*id.* at 431, citing *Western & Southern Life Ins. Co. v U.S. Bank N.A.*, 209 AD3d 6, 13 [1st Dept 2022] [holding that identical language in a RMBS Trust governing agreement "does not clearly assign defendant (trustee) the *duty* to enforce the seller's obligation to repurchase defective loans"] [emphasis in original]).

We agree with defendants and the dissent below that the relevant language does not impose an affirmative duty on the part of the Trustee to enforce repurchase obligations, but instead explains that the Trustee must act for the benefit of certificateholders when the Trustee is exercising the rights described in section 2.06 (*see e.g. Phoenix Light SF Ltd. v Deutsche Bank Nat'l Tr. Co.*, 585 F Supp 3d 540, 591 [SD NY 2022] ["The 'rights referred to above' language is properly understood to 'delineate that the trustee holds the trust fund for the benefit of the investor rather than for the trustee's own benefit or the benefit of any other party to the (governing agreements),' rather than to generate any implied duties"], quoting *Western & Southern Life Ins. Co. v BNY Mellon*, 2019-Ohio-388, ¶¶ 25-27, 129 NE3d 1085, 1093-1094 [Ct App 2019] [applying New York law]).

First, the relevant provision addresses the larger role of the Trustee with respect to certificateholders, and the preceding sentences speak to the Trustee's acknowledgement that it has "executed and delivered . . . the Certificates in authorized denominations evidencing directly or indirectly the entire ownership of the Trust Fund." That is not where one would expect to find an enforcement mechanism for the repurchase protocol required of third parties that is outlined several sections above.

Moreover, a right is not a duty (*see Western & Southern*, 209 AD3d at 13 [noting "the distinct difference between a right and a duty under the" governing agreements and concluding that "the overt language relied on by plaintiffs demonstrates that they are discussing an action that *may* be exercised at a party's discretion"] [emphasis in original]). The disputed language does not transform the discretionary nature of the Trustee's ability to exercise rights into a duty to do so. As the governing agreements specifically provide, "the rights of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty."

Reading the challenged language to impose an implicit duty would require us to disregard the numerous contractual provisions expressly limiting the Trustee's duties to "only such duties as are specifically set forth in this Agreement" and prohibiting the imposition of implied duties. Assumption of an affirmative duty to enforce repurchase obligations based on language referencing the "exercise of rights" is inconsistent with each one of these provisions (*see Phoenix Light*, 585 F Supp 3d at 591 ["(I)t would be improper to interpret the vague, general language of the 'rights referred to above' clauses to create an implied repurchase duty in direct contravention of the (governing agreements') other provisions"]); *Phoenix Light SF Ltd. v Wells Fargo*, 2022 WL 2702616, at \*23 n 30 [SD NY, July 12, 2022, No. 15 Civ 10102, 15 Civ 10033 (KPF) (SN)] [the court was "unpersuaded" by the "rights referred to above" argument in support of a repurchase enforcement duty, finding that it "fails to overcome the plain text of the" governing agreements]; *Commerzbank AG v U.S. Bank Nat'l Ass'n*, 457 F Supp 3d 233, 258 [SDNY 2020] ["The (governing agreements) are complicated and intricate

agreements that impose numerous obligations" and "(e)ngrafting a generalized good faith

obligation that creates additional undefined duties is a bridge too far," particularly since

"the (agreements) expressly limit the duties of the Trustee"]).

Those provisions in the governing agreements that do impose an express duty on

parties, including the Trustee, use explicit language and provide details regarding the

extent of the parties' obligations. Comparing the "exercise the rights referred to above"

language with the mandatory language found throughout the governing agreements

further demonstrates that section 2.06 was not intended to transform discretionary rights

into affirmative duties (*see IKB*, 208 AD3d at 435-436 ["It is clear from the agreements

that the drafters understood what language to use to impose an affirmative duty on the

trustee"] [Singh, J., dissenting]). For example, the repurchase protocol itself advises that

the obligated party "shall cure" the breach or repurchase the loan; section 2.01 (b)

discusses the steps a Trustee "shall" take with respect to the receipt of required

documents; and section 3.06 (e) provides that the Trustee "shall establish and maintain"

the certificate account.

Significantly, the Trusts at issue here—that do not expressly provide for the

enforcement of repurchase obligations—are in the minority. Of the 86 Trusts at issue in

the larger litigation, 61 have governing agreements that contain language expressly

providing that the Trustee "shall enforce the seller's obligation . . . to repurchase" or that

another party acting on the Trustee's behalf "shall enforce" the repurchase obligation.

Omission of such language in the 25 agreements at issue here is compelling proof of the

lack of an affirmative duty to enforce the repurchase protocol. Contrary to the Appellate

Division majority's conclusion that evidence of these different agreements cannot support

a conclusion that "the drafters omitted a pre-EOD duty of the trustee" because "the

numerous agreements at issue involved different parties, were executed on different days,

and effectuate different purposes" (208 AD3d at 427), we have often compared

contractual provisions, specifically in RMBS litigation, to "ascertain their meaning" (*id.*

at 435; *see U.S. Bank N.A. v DLJ Mtge. Cap.*, *Inc.*, 38 NY3d 169, 180-182 [2022]

[comparing similar contractual provisions across recent precedent]; *Deutsche Bank*, 34

NY3d at 340-341 [interpreting contractual provisions consistent with a "[r]eview[ of]

substantially the same contract terms in other RMBS cases"]; *see also Quadrant*

*Structured Prods.*, 23 NY3d at 562 [comparing contractual language in separate

litigation]).

The argument to the contrary, that the inclusion of this language in some

agreements but not in others is " 'belt and suspender' language" that is "the product of

being added to a form agreement that was 'duped out' as part of the deal documents in

some cases but not others" (*Finkelstein v U.S. Bank, N.A.*, 75 Misc 3d 1202 [A], at *2

[Sup Ct, NY County 2022]), would require us to disregard the plain language of the

contracts and resort to unsupported speculation about the drafting process.  Another court

reasoned, in finding a duty to enforce in the language of section 2.05, that the "rights

referred to above" language "must incorporate the rights articulated" in the repurchase

protocol, and so "[d]efendant has an obligation to 'exercise [its] rights' to enforce the

substitution and repurchasing remedies" (*see Royal Park Investments SA/NV v Deutsche*

*Bank Natl. Tr. Co.*, 2016 WL 439020, at *4 [SD NY, Feb 3, 2016, No. 14 Civ 4394

(AJN)]). We do not find this analysis in any way persuasive (*id.*; *see Zitman v The Bank of N.Y. Mellon*, 2022 NY Slip Op. 31527 (U), 2022 WL 1471261 [Sup Ct, NY County 2020] [relying exclusively on Supreme Court's analysis here]; *see also* Wilson, Ch. J., dissenting op at 10-12).

Accordingly, we hold that the "rights referred to above" language does not impose an affirmative duty on the Trustee to enforce repurchase rights. This result adheres to the language and structure of the contract and is consistent with the role of the Trustee prior to an EOD. Accordingly, plaintiffs' claims arising out of the pre-EOD repurchase enforcement claims for these 25 Trusts should be dismissed.

IV.

The Appellate Division held that plaintiffs' tort claims, based on breaches of conflicts of interest and post-EOD fiduciary duties, were maintainable "except insofar as the [fiduciary duty claims are] based on defendants' failure to act as contractually required" (208 AD3d at 430-431). We hold that, to the extent any tort claims remain, they should be dismissed as duplicative of the breach of contract claims.

The courts below here and in similar RMBS litigation, as well as federal courts applying New York law in RMBS litigation, invoke the "economic loss doctrine" when determining whether tort claims are maintainable alongside breach of contract claims (*see IKB*, 2021 WL 358318, at *21; *IKB*, 208 AD3d at 430-431; *see also National Credit Union v Deutsche Bank,* 410 F Supp 3d 662, 687-689 [SD NY 2019]); *Triaxx Prime CDO 2006-1, Lt.d v Bank of N.Y. Mellon*, 2018 WL 1417850, at *6-7 [SD NY, Mar. 8, 2018, No. 16 Civ 1597 (NRB)]); *BlackRock Allocation Target Shares: Series S Portfolio*

*v Wells Fargo*, 247 F Supp 3d 377, 399 [SD NY 2017]).  These courts appear to conflate

our "economic loss" rule with the prohibition against duplicative contract and tort claims.

However, this Court's " 'economic loss' rule . . . stands for the proposition that an end-

purchaser of a product is limited to contract remedies and may not seek damages in tort

for economic loss against a manufacturer," and does not have application beyond the

products liability context (*532 Madison Ave. Gourmet Foods, Inc. v Finlandia Center,

Inc.*, 96 NY2d 280, 288 n 1 [2001]).  We clarify that the rule does not apply here.

We instead evaluate the remaining tort claims to determine whether they are

duplicative of the contract claims.  "[A] simple breach of contract is not to be considered

a tort unless a legal duty independent of the contract itself has been violated" and "

'where plaintiff is essentially seeking enforcement of the bargain, the action should

proceed under a contract theory' " (*Dormitory Auth. v Samson Constr. Co.*, 30 NY3d

704, 711-13 [2018], quoting *Sommer v Federal Signal Corp.*, 79 NY2d 540, 552 [1992]).

In determining whether claims are duplicative, we "evaluate[] the nature of the injury,

how the injury occurred and the harm it caused" (*id.*).  Applying that test here, we

conclude that any remaining tort claims, alleging conflict of interest and fiduciary duty

violations, must be dismissed.

On a CPLR 3211 motion to dismiss, "our task is to determine whether plaintiffs'

pleadings state a cause of action" by assessing "the pleadings' four corners," "liberally

constru[ing] the complaint," and "accept[ing] as true the facts alleged in the complaint"

(*511 West 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 151-152 [2002]).

With respect to plaintiffs' conflict of interest claims, the complaint alleges that

defendants failed to "enforce representations claims or declar[e] Servicers in default" because they were operating under a conflict of interest. Plaintiffs are, therefore, alleging that defendants breached their contractual duties *because of* conflicts of interest.[3] Indeed, plaintiffs use identical language when describing their contract-based claims, alleging that defendants "breached each Governing Agreement" by "failing to enforce the Sellers' obligation to repurchase, substitute, or cure the defective mortgage loans" and by "fail[ing] to deliver written notices to the Servicers of the defaults or terminate the Servicers."

Likewise, plaintiffs allege that defendants breached their post-EOD fiduciary duties by failing to act as a "prudent person" would have. Yet this same language forms the basis of plaintiffs' breach of contract claims, in which they allege that by failing to act as a "prudent person" would have, as required by section 8.01 of the governing agreements, defendants "materially breached the Governing Agreements." Nor can we agree with the partial dissent that the absence of a definition of any " 'prudent person' duties" from the governing agreements transforms a duplicative allegation containing that term into an independent tort (*see* Troutman, J., dissenting op at 3). Similarly, plaintiffs simultaneously allege that "Wells Fargo's failure to investigate and promptly enforce the Servicers' servicing obligations constituted breaches of Wells Fargo's fiduciary duty to the Trusts and their investors" and "[b]y failing to [investigate non-compliance with

---

[3] Duplicative tort claims do not survive simply because, at the same procedural stage, we have rejected the contractual claims (*see* Troutman, J., dissenting op at 4).

Servicer obligations], Wells Fargo materially breached the Governing Agreements"—
identical allegations under the guise of separate claims.

The harm alleged by plaintiffs also demonstrates that the claims are duplicative.
For example, the complaint alleges that the torts committed by defendants "diminished
the value of the assets owned by the Trusts and have diminished the principal and interest
payments generated by those assets." In identical language, plaintiffs allege that in
breaching the terms of the agreements, defendants "diminished the value of the assets
owned by the Trusts and have diminished the principal and interest payments generated
by those assets." There is "no injury alleged here that a separate [tort] claim would
include that is not already encompassed in [plaintiffs'] contract claim" (*Dormitory Auth.*,
30 NY3d at 713) and the partial dissent does not identify any nonduplicative injury.
Where "[t]he only damages alleged under either theory of recovery" are "identical for
both claims," such damages are "within the contemplation of the parties under the
contract" and the non-contractual claims must be dismissed as duplicative (*id.*). All
remaining tort claims at issue on this appeal must therefore be dismissed.

Accordingly, the order of the Appellate Division insofar as appealed from should
be modified, without costs, in accordance with this opinion, and as so modified, affirmed,
and the certified question should be answered in the negative.

WILSON, Chief Judge (dissenting in part):

I agree with the majority that the "no action" clause does not prevent a suit against the Trustee (section II of the majority opinion) and that IKB's tort claims should be dismissed as duplicative of their contractual claims (section IV of the majority opinion). However, I disagree with the majority's holding in Section III. Because the posture of

- 1 -

this case is on a motion to dismiss, IKB's claims should be allowed to proceed, at least until summary judgment, unless the contracts here—the 26 Pooling and Servicing Agreements at issue—clearly provide that the Trustee has no duty to enforce the repurchase protocol outlined in the preceding provisions of the PSA.  If for no other reason than that numerous lower courts – including the Appellate Division panel in this case – have reached contrary results about the meaning of the relevant provisions, this question should not be resolved on a motion to dismiss but requires discovery as to the intent of the parties, including the negotiation and drafting history of the relevant provisions.

Indeed, the majority's interpretation of the central contractual provision, Section 2.06, is contrary to its plain language and rests on an unsupportable distinction. According to the majority, when a contract specifies that one party "shall enforce" a contractual right, that obligates the party to do so, but if the contract instead specifies that one party "agrees to enforce" a right, the party is under no obligation to do so. Furthermore, an essential element of the majority's analysis is to compare the agreements at issue here to other agreements involving different parties.  Not only is that an extremely dubious way to determine the meaning of the terms in the contracts at issue, but the reliance on the terms of other agreements is reliance on parol evidence, *which the majority cannot consider unless the at-issue contracts are not clear on their face.*  Of course, if they are not clear on their face, the Trustee's motion to dismiss must be denied, to allow for the development of a factual record.  For the reasons stated below, I dissent

and would affirm the holding of the Appellate Division denying the motion to dismiss with respect to plaintiffs' claims predicated on a violation of Section 2.06.

I.

Although "Residential Mortgage Backed Securities" may sound ominous, having a basic understanding of their purpose and structure is useful in understanding the present dispute. Traditionally, home buyers went to a bank (or savings and loan), convinced the bank that the home buyer had sufficient income and other resources to afford the monthly payments (and associated costs, like taxes and insurance) for the bank to conclude that the home buyer was very likely to be able to make the payments, and obtained a loan that way. The bank secured the loan against the property by way of a mortgage, which, in combination with the proof of loan worthiness supplied by the borrower, gave the bank a good measure of security. Because traditional home lenders usually held the loans through maturity, those lenders tended to be conservative – that is, they required proof of substantial income, properly documented, and would lend an amount substantially less than the appraised value of the home. All of this provided for a relatively tight credit market for homebuyers.

The concept behind RMBS was that, by creating pools of thousands of home mortgages and selling interests in those pools to investors, the credit market could be loosened – first, because the securitization (that is, selling shares in the pool, called "certificates") would attract investors from outside the traditional lenders; and second, because the pooling and securitization could provide protection against failures of

individual loans.  The pooling, though, had another important consequence: lenders other than traditional banks sprung up to issue home loans to borrowers less able to meet the stricter requirements of banks, often referred to as "subprime."  Those mortgages, when pooled, often provided a higher return to the investors in the securities but carried a higher risk of default.

The formation of the collateral pool for an RMBS starts with a sponsor purchasing thousands of mortgages from one or more originating lenders (dubbed originators within the RMBS transaction) (June Rhee, *Getting Residential Mortgage-Backed Securities Right: Why Governance Matters*, 20 Stan. J.L. Bus. & Fin. 273, 291-92 [2015]).  The sponsor then transfers the pool to a depositor, another financial institution, which in turn transfers the pool into the RMBS trust (*id*).  For several reasons, neither the sponsor nor the depositor typically knows about the quality of the underwriting of the pooled loans. First, neither the sponsor nor the depositor originated the loans or was involved in evaluating the creditworthiness of the borrowers or the value of the secured property. Second, the sheer volume made due diligence impracticable (*id*).  Third, as a practical matter, the investors in the certificates would not care about the breach of the representations and warranties unless the loan went into default, so that prospective due diligence was unnecessary if the PSAs included a mechanism to make certificateholders whole when individual loans defaulted, and the representations and warranties had been breached as to that loan.  Thus, to ensure that the securities would be marketable and that the price investors are paying for the certificates fairly reflects the value of the pooled

collateral, the originator makes a series of representations and warranties to the sponsor and any subsequent recipient that the mortgages are of the quality that the agreement states they are (*id* at 292).  Those representations include the guarantee that the information regarding the creditworthiness of the borrower and the value of property is accurate (*id*).  If any mortgage is in breach of those representation and warranties (*e.g.*, if a borrower's creditworthiness has been misstated or if required documents are missing from the file), the originator must repurchase or replace the defective mortgage (*id*; *see also* Kathleen C. Engel and Patricia A. McCoy, *Turning a Blind Eye: Wall Street Finance of Predatory Lending*, 75 Fordham L. Rev. 2039, 2061-62 [2007]).

The certificateholders have the economic interest in the RMBS pool, yet have no direct relationship with the other parties to the transaction (*id*).  The investors rely upon the Trustee, their representative in the transaction, to monitor the accuracy of the mortgage information and to act when it discovers that any representation or warranty is breached (*id*).  Thus, it is vital to the marketability of the RMBS that the Trustee can, and must, demand a repurchase of any defective mortgage that is in default.  The repurchase/replacement right is a key mechanism by which the investor is assured of the soundness of the investment, given the lack of examination into the individual loan files before the loans are pooled.

## I.

The complaint alleges that the Trustees breached two different duties.  First, IKB alleges the Trustee has a duty "to review (or cause to be reviewed) each of the Mortgage

Files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete," and further provides that "[i]f there was a defect with any mortgage file . . . to demand that the Obligor cure the defect leading to the exception or repurchase or replace the defective loans." The complaint also alleges that if the Obligor does not cure these document defects, the Trustee has a duty "to enforce its rights for the benefit of investor to ensure that mortgage loans lacking complete Mortgage Files were removed from the mortgage pools underlying the securities."

Section 2.06 of the at-issue PSAs, around which this dispute roils, provides:

> "The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement in accordance with its terms." [1]

The "rights referred to above" – that is, in the sections preceding Section 2.06 – include the right to have defective loans replaced or repurchased (2.02, 2.05[2]) and the right to rely on the representations and warranties made by the Seller (2.03). Thus, the

---

[1] As the majority notes, this section appears in nearly identical form in all 25 at-issue PSAs.

[2] "Section 2.05 (b). Upon discovery by the Depositor, the Seller, a Servicer or the Trustee that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall promptly (and in any event within five (5) Business Days of discovery) give written notice thereof to the other parties. *In connection therewith, the Trustee shall require the Seller, at the Seller's option, to either (i) substitute, if the conditions in Section 2.03(d) with respect to substitutions are satisfied, a Qualified Substitute Mortgage Loan for the affected Mortgage Loan, or (ii) repurchase the affected Mortgage Loan within 90 days of such discovery in the same manner as it would a Mortgage Loan for a breach of representation or warranty made pursuant to Section 2.03*. The Trustee shall reconvey to the Seller the Mortgage Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty contained in Section 2.03" (HEAT 2006-2 PSA [emphasis added]).

PSAs clearly state that the Trustee "agrees to . . . exercise the rights referred to above for the benefit of all present and future Holders of the Certificates." The language could not be clearer: the Trustee agrees to exercise whatever rights are "above" Section 2.06, for the benefit of the certificateholders. No one disputes that replacing or repurchasing defective loans or enforcement of the representations and warranties would benefit the certificateholders.

Even putting aside, the clarity of the contractual language, examining the PSA as a whole leads to the same conclusion. The sponsor and depositor are generally not the issuers of the underlying loans and have not done any due diligence to verify the completeness of the loan file or its compliance with the numerous representations and warranties set out in the PSAs. The replacement or repurchase obligation exists to ensure that if a loan is in default and a representation or warranty is breached (*e.g.*, the borrower's income verification or the property appraisal was not in the file, or the proper loan-to-value ratio was exceeded), the certificateholders would not be harmed by the lack of due diligence when creating the pool. No one disputes that the repurchase/replacement right exists. As a practical matter, the certificateholders cannot enforce that right, because only the Trustee holds the loan files, and is obligated to do so. Moreover, the certificateholders are essentially passive investors in the pooled mortgages, charged with no duties with regard to the enforcement of rights contained in the PSAs. The Sponsor and Depositor no longer hold the loan files and have every interest in not triggering the repurchase/replacement obligation, because one or both would suffer from having to

replace the defective nonperforming loan with a good loan or cash. Given the lack of due diligence when pooling the loans, the way in which the potential investors could be convinced of the soundness of an investment was through the repurchase/replacement obligation, which only the Trustee is in a position to enforce.

## II.

To evade the clear language by which the Trustee agreed to exercise the rights above, the majority assembles a sequence of points that go nowhere. The majority begins by emphasizing that the PSAs contain "numerous contractual provisions expressly limiting the Trustee's duties to 'only such duties as are specifically set forth in this Agreement'" (majority op at 10). I fully agree that the Trustee's duties are those specifically set forth in the PSA, but the PSA specifically says that the Trustee agrees to exercise the rights contained above Section 2.06. Moreover, even were there any lack of clarity about what rights were "above" Section 2.06, that question could not be resolved on a motion to dismiss.

The PSAs expressly limit the Trustees' duties to those specifically set forth in the agreement for a good reason: An ordinary trustee of a corpus held for the benefit of others has a panoply of fiduciary duties not applicable to RMBS Trustees. For example, regular trustees have many duties imposed by law, such as the duty to preserve the trust corpus by diversifying investments (*Matter of Steinberg*, 183 AD3d 1067, 1074 [3d Dept 2020), the duty to make the trust property productive (*In re Hubbell's Will*, 302 NY 246, 256 [1951]), and the duty to invade the trust corpus if necessary for the wellbeing of the

beneficiaries (*In re Picard's Estate*, 125 NYS2d 84, 85-86 [NY Cty Surrogate Ct 1953]), among others (*see* Restatement of Trusts, 2nd §§169-185). Those duties would contravene the purpose and structure of RMBS trusts; the language to which the majority points helps emphasize that the duties and obligations of the Trustee are those consistent with the securitization and sale of the certificates as set forth in the PSAs, which undercuts the majority's argument. (Those provisions also demonstrate why I disagree with my colleague, Judge Troutman: the PSAs strip the Trustees of any duties not specifically set forth in the PSAs, so that there can be no tort claim by the certificateholders against the Trustees arising from the Trustees' role.)

Next, the majority contends that the "rights to referred to above" language is merely a reference to the Trustee's obligation, contained in the preceding part of the sentence, to hold the trust fund for the benefit of all certificateholders. But as the majority itself later explains, a right and a duty are not the same. The Trustee has a duty to hold the trust fund for the benefit of the certificateholders, but it would be strange to refer to that as a "right" of the Trustee (or the certificateholders). The rights above are the rights to replacement or repurchase of loans that do not comply with the representations and warranties. Moreover, if "rights referred to above" were a mere reiteration of the first part of the sentence, those words would be superfluous, a result contrary to a bedrock principle of contract interpretation, that every word and clause in the contract should be given meaning (*Corhill Corp. v S. D. Plants, Inc.*, 9 NY2d 595, 599 [1961]).

The majority next relies on its view of how an ideal RMBS agreement should be structured, pointing out that "[Section 2.06] is not where one would expect to find an enforcement mechanism for the repurchase protocol" because the section generally and by its title, addresses the execution and delivery of the certificates, not anything to do with repurchasing defective loans. There are several problems with the majority's conclusion. First, there is no record evidence of where one would expect to find enforcement mechanisms in RMBS agreements and the majority's conclusion sure sounds like a factual finding. Second, the text of the portions of Section 2 that precede Section 2.06 contain pages of detail about the repurchase and replacement rights. Although one might have chosen to place the enforcement mechanism at a far distant point in the hundred-page-long PSA, placing it in Section 2.06 – immediately adjacent to the statement of rights – hardly seems unreasonable.

The next – and key – step in the majority's analysis is its distinction between a right and a duty. From that distinction, the majority contends that that Section 2.06 speaks only in terms of the Trustee's *right* to do something, not its duty, and any obligation imposed by the section is no obligation at all—rather the contract has relegated it to the total discretion of the Trustee (majority opinion at 10). That argument fundamentally misstates the PSAs' language. In Section 2.06, the Trustee "agrees to exercise" the rights above, for the benefit of the certificateholders. Agreeing to exercise a right for the benefit of another is a duty to do so. When interpreting contracts, we give words their ordinary meaning. If you have a winning lottery ticket, and I agree to enforce

your right to collect the jackpot, I have assumed a duty to do so, for which I can be held

liable in breach.  Contracts in which an agent agrees to exercise rights on behalf of a

principal are common; such agreements impose a duty on the agent to act for the benefit

of the principal.

The majority cites three cases interpreting provisions similar to Section 2.06 as not

imposing a duty to exercise the repurchase/replacement rights (majority opinion at 9-10).

There are more cases, not even counting the Appellate Division decision in this case,

holding the opposite (*See IKB Intl., S.A. v Lasalle Bank N.A.*, 2021 WL 358318, at *11

[Sup Ct NY Cty Jan. 27, 2021], *affirmed in relevant part* 208 AD3d 423, 425 [1st Dep't

2022]; *Zittman v The Bank of N.Y. Mellon*, 2022 WL 1471261, at *5, [Sup Ct NY Cty

Nov. 5, 2020]; *Finkelstein v U.S. Bank, N.A.*, 75 Misc. 3d 1202(A), at *5 [Sup Ct NY Cty

May 2, 2022]; *Royal Park Invs. SA/NV v Deutsche Bank Natl. Trust Co.*, 2016 US Dist

LEXIS 12982, at *12 [SDNY Feb 3, 2016, No. 14-CV-4394 (AJN)] (Section 2.05

"creates an obligation to enforce breaches of R&Ws of which [the Trustee] has

knowledge"]).  Of course, our job is not to measure the stacks of lower court cases and

pick the larger stack.  The relatively equal split in interpretation, however, strongly

suggests that the contractual language is not clear on its face, and therefore cannot be

resolved on a motion to dismiss.[3]  In any event, it would be quite difficult to argue that

---

[3] It is noteworthy that the New York Supreme Court decisions uniformly holding that Section 2.06 obligates the Trustee to enforce the repurchase/replacement protocol were decided by three of our experienced Commercial Division Justices.  The contrary federal district court cases relied on by the majority, *Commerzbank AG v U.S. Bank Natl. Assn.*

conflicting lower court interpretations provide any sort of persuasive precedent that should influence our decision.

Finally, the cornerstone of the majority's opinion – that other PSAs involving other parties drafted at other times by unidentified lawyers contain different, allegedly clearer wording of those Trustees' obligations, from which we should conclude that the parties to these 25 PSAs meant something different – is more like quicksand than a cornerstone. The majority observes that there is a difference between the language used in the 25 at-issue PSAs and other PSAs consolidated into this same litigation, which use mandatory language when imposing an obligation to repurchase upon the Trustee (majority op at 11). As an example, one of the other PSAs provides that the Trustee "shall enforce the obligations of . . . the Seller . . . and cause the . . . Seller . . . to repurchase" (MSM 2007-3XS PSA; Section 2.05 [a][vi]). In essence, the majority's point is that if the drafters of the agreements at issue here wanted to impose a repurchase obligation upon the Trustee, they would have used the more mandatory language found in the other agreements.

---

(457 F Supp 3d 233, 257-58 [SDNY 2020]) and *Phoenix Light SF Ltd. v Deutsche Bank Natl Tr Co* (585 F Supp 3d 540, 591 [SDNY 2022]) rely solely on an Ohio state court decision, *Western & Southern Life Ins. Co. v Bank of N.Y. Mellon* (129 NE3d 1085, 1093-94 [Ohio Ct App. 2019]), which found –*after a bench trial*-- that a comparable Section 2.06 in the PSA there did not obligate the Trustee to enforce the repurchase/replacement protocol. Both *Phoenix Light* and *Commerzbank*, on which the majority also relies, were decided on summary judgment, not a motion to dismiss, and therefore do not support dismissal here.

As a preliminary matter, agreeing to do something is the same as saying you "will" or "shall" do something—when a party agrees to do something, that party will be in breach of its obligation under the contract if it fails to do what was promised (*see, e.g.*, *Davies, Hardy, Ives & Lawther v Abbott*, 38 NY2d 216, 219 [1975] ["It is even clearer, in our view, that the use of the verbal phrase, 'agrees to assume' can only be understood as manifesting a commitment to some obligation."]; *O'Brien v Home Ben. Soc.*, 117 NY 310, 318 [1889] ["By its certificate and the conditions annexed thereto, and under its by-laws, the defendant *agreed to do something*, *and that was to make an assessment upon its members for a death claim* and to pay the proceeds not exceeding the stipulated amount . . . *When the defendant refused to make an assessment it violated its contract*, and became liable to the plaintiff for the damages caused by such violation"] [emphases added]).

But, given the procedural posture of this case, there is a further, insuperable problem with the majority's reliance on different terms of other PSAs. "Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract" (*Schron v Troutman Sanders LLP*, 20 NY3d 430, 436 [2013]). The majority's reliance on the text of other agreements drafted by unknown persons at unknown times involving different parties necessarily means the majority believes that the terms in dispute here are ambiguous. Because the case comes to us on a motion to dismiss, if we believe the agreement is ambiguous, we should affirm the denial of the motion to dismiss so the parties can conduct discovery relevant to the resolution of the ambiguity. Under "ordinary contractual principles . . . the fact that an agreement is

ambiguous does not result in a grant of summary judgment in either party's favor" (*Gray v Pashkow*, 79 NY2d 930, 932 [1992]; *see also Aronson v Riley*, 59 NY2d 770, 773 [1983]). Furthermore, trying to determine the intent of parties to an agreement by reference to the terms of a different agreement between different parties executed at a different time is a highly dubious – and unprecedented – proposition. For example, one of the 25 at-issue agreements is a PSA among Credit Suisse (depositor), OCWEN Loan Servicing (servicer), Wells Fargo Bank (servicer), Select Portfolio Servicing, Inc. (servicer and special servicer) and U.S. Bank National Association (trustee). One of the "comparable" agreements with different terms is among Morgan Stanley Capital I, Inc. (depositor), Wells Fargo Bank, National Association (master servicer and securities administrator) and LaSalle Bank National Association (trustee). There is no reason whatsoever to think the terms of the latter agreement would shed light on the intent of the parties to the former. It is of course possible that some of the agreements with different language were drafted close in time by the same lawyers with an exact identity of parties, which might at least arguably provide some relevant evidence as to whether any different enforcement was intended, but: (1) neither the defendants nor the majority has done that work; and (2) because the case arrives on a motion to dismiss, we cannot know whether these different agreements have any relevance in determining the intent of the parties in the 25 at-issue agreements.

III.

Were I to resort, as the majority has, to examining other RMBS transactions with different language to test the proposition of whether "agrees to exercise the rights above" meant something different from "shall enforce the obligations of . . . the Seller . . . and cause the . . . Seller . . . to repurchase",  I would look not look just at the PSAs from unrelated transactions involving different parties, but instead would look at the integrated set of documents concerning the RMBS transactions being compared—most particularly, the offering prospectus for the securities.[4]  If, as the majority hypothesizes, the Trustees in the 25 PSAs at issue here have no obligation to enforce the repurchase/replace right, but in others do, that difference would be highly material, and would have to be disclosed in the prospectuses.

Unquestionably, the difference in RMBS pools where the Trustee had an obligation to enforce the repurchase/replace right and those where it had no such obligation would be highly material, as evidenced by the fact that the prospectuses consistently disclose as a material risk the possibility that the replacement or repurchase

---

[4] Because the PSA and prospectus for an RMBS transaction are drafted and executed at the same time and cross reference each other, contract principles dictate they should be read together as an integrated document (*Nau v Vulcan Rail & Constr. Co.*, 286 NY 188 [1941]; *see also Wells Fargo Bank, N.A. v Fin. Sec. Assur. Inc.*, 504 F Appx 38, 40 [2d Cir 2012] ["we reject Assured's argument that the district court erred in considering, in interpreting the PSA, the Prospectus Supplement and other transaction documents related to the PSA. Under New York law, which governs the PSA, the district court properly considered all writings forming part of a single transaction"], citing *This Is Me, Inc. v Taylor*, 157 F3d 139, 143 [2d Cir 1998]).

of a mortgage may reduce the expected interest to be earned by the trust.[5] *A fortiori*, a Trustee's failure to enforce the replacement/repurchase right would be far more material than the mere difference in interest that might be earned on a replaced or repurchased loan. The prospectuses for the PSAs with the "agrees to exercise" and the "shall enforce" language do not differ in the disclosure of risk in that regard.[6] No "agrees to enforce" prospectus identifies any additional measure of risk arising from the possibility that a Trustee may discretionarily decide not to enforce the repurchase/replacement right.

I highlight this to make the following point: if potential diminution of interest earned on repurchased loans was sufficiently material to warrant a disclosure, the alleged contractual difference that would allow the Trustee to choose not to require the repurchase or replacement of a defective loan would have been far more material, yet is not disclosed in any prospectus, regardless of the obligatory language in Section 2.06 or

---

[5] *Compare, e.g.*, "When a mortgage loan is prepaid in full or repurchased, excess interest will generally be reduced because the mortgage loan will no longer be outstanding and generating interest" (Prospectus for ABFC 2006-OPT3, a "shall enforce" transaction), with "the responsible party may be required to purchase mortgage loans from the trust . . . which will have the same effect on the holders . . . as a prepayment of those mortgage loans" and if "principal is repaid faster than you anticipate, then your yield may be lower than you expect" (Prospectus for FFML 2004-FF6, an "agrees to exercise" transaction.)

[6] For the purpose of my examination, I have taken three PSAs with the "agrees to exercise" language (FFML 2004-FF6, Section 2.05; MSAC 2004 OP1, Section 2.04; MSAC 2005-WMC6, Section 2.04) and three with the "shall enforce the obligations" language (CARR 2006 NC5, Section 2.03; CARR 2006-RFC1, Section 2.03; ABFC 2006-OPT3, Section 2.03), and matched them to the corresponding prospectuses (CARR 2006 NC5 Prospectus; CARR 2006-RFC1 Prospectus; ABFC 2006-OPT3 Prospectus; FFML 2004-FF6 Prospectus; MSAC 2004 OP1 Prospectus; MSAC 2005-WMC6 Prospectus) which are official documents filed with the SEC of which we may take judicial notice (*Caprio v New York State Dept. of Taxation & Fin.*, 25 NY3d 744, 756 [2015]).

elsewhere.  In other words, if one chooses the majority's route of trying to draw conclusions about the 25 at-issue PSAs by looking at other transactions as to which they know nothing about comparability of drafting, the one thing we do know is that the SEC requires that the prospectuses disclose all material risks, and the prospectuses for the different PSAs contain no different disclosure of risks, and no disclosure of any risk that the Trustee might simply choose not to exercise the repurchase/replacement rights above, even though it agreed to do so.

V.

To accept the majority's interpretation of Section 2.06, one would have to believe that the parties involved in the 25 at-issue RMBS securitizations engaged in massive and repeated securities fraud by failing to disclose to potential investors that a risk of the agreement was that the Trustee could sit idly by, as the sole entity in possession of the documents showing whether contractual representations and warranties had been breached, learned of those breaches, learned that loans were in default, and allow the value of the securities to collapse instead of exercising the repurchase/replacement right held on behalf of the certificateholders.  I do not believe that for a second.  Instead, what is clear—from the plain language of Section 2.06, from the structure and objectives of RMBS pooling arrangements, from the disclosures in the prospectuses, and from common sense, is that no one expected that RMBS Trustees could fiddle while Rome burned.  But even if one thought that was a possibility, it is not one to be decided on a motion to dismiss.

TROUTMAN, J. (dissenting in part):

I agree that plaintiffs were not required to comply with the no-action clause and that, for the 25 trusts to which the issue pertains, section 2.06 of the governing agreement does not impose a duty upon the trustee to enforce the cure or repurchase protocol against the

- 1 -

obligated parties before an event of default. I therefore join sections II and III of the majority writing. I further concur with the majority's observation in section IV that the economic loss rule pertains only to the products liability context and has no application here. I respectfully disagree, however, with that part of section IV which concludes that plaintiffs' remaining tort claims must be dismissed as duplicative of their breach of contract claims.

On a CPLR 3211 motion to dismiss, we are obligated to give the pleading a liberal construction, "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). "The criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one" (*id.* at 88 [internal quotation marks dismissed]). Applying this liberal standard, I would allow plaintiffs' remaining tort claims to proceed to discovery.

" 'It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated' " (*Dormitory Auth. of the State of N.Y. v Samson Constr. Co.*, 30 NY3d 704, 711 [2018], quoting *Clark-Fitzpatrick, Inc. v Long Is. R.R. Co*., 70 NY2d 382, 389 [1987]). The Court has identified several factors that are relevant to a determination of whether a tort claim is duplicative of a contract claim, including, but not limited to, the "nature of the injury, how the injury occurred, and the harm it caused" (*Dormitory Auth.*, 30 NY3d at 711; *see also New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 316 [1995]). If the plaintiff has identified an independent legal duty, however, and is not simply seeking enforcement of

its contractual bargain, the tort claim is not duplicative (*see Dormitory Auth.*, 30 NY3d at 711-712; *Sommer v Federal Signal Corp.*, 79 NY2d 540, 551-552 [1992]).

With respect to plaintiffs' cause of action alleging breach of fiduciary duty, the complaint[*] alleges that after an event of default (EOD), the trustee owed a fiduciary duty to the trust and its investors. The complaint further alleges that the trustee breached that fiduciary duty by failing to investigate whether there were additional breaches of representations and warranties that required enforcement of the cure and repurchase protocol. Although the Pooling and Servicing Agreement (PSA) obligates the trustee to act as a "prudent person" would in the exercise of its own affairs after an EOD, the PSA does not expressly define those "prudent person" duties. Moreover, plaintiffs' breach of fiduciary duty claims have been narrowed by the courts below such that only those post-EOD claims that are not based upon the trustee's failure to act as contractually required remain (*see* 208 AD3d 423, 424, 431 [1st Dept 2022]). Inasmuch as the PSA does not expressly define the trustee's "prudent person" or fiduciary duties post-EOD, plaintiffs have identified a "legal duty independent of the contract itself" (*Dormitory Auth.*, 30 NY3d at 711), i.e., a duty arising from the trustee's fiduciary obligations after an EOD.

Plaintiffs' conflict of interest claims should also survive dismissal. Contrary to the majority's assertion (*see* majority op at 15), plaintiffs are not alleging that defendants' conflicts of interest led to their breach only of contractual duties. Plaintiffs also allege that defendants made decisions regarding discretionary actions that they were not contractually

_____

[*] As the majority notes (*see* majority op at 4 n 1), although there are multiple complaints involved in this litigation, the parties have agreed to treat one complaint as representative.

obligated to take based on the influence of certain conflicts of interest.  For example, the complaint alleges that the trustees' conflicts of interest led them to "refrain[ ] from enforcing the Trusts' rights for breaches of a representation and warranty regarding the mortgage loans."  Yet, for 25 of the trusts at issue in this litigation, the Court is (correctly, in my view) concluding that the trustee had no contractual pre-EOD duty to enforce the cure or repurchase protocol against the obligated parties.  In other words, for those 25 trusts, the trustee had no pre-EOD contractual duty to enforce the cure or repurchase protocol, but it did have an obligation to make its discretionary decision as to whether to exercise that enforcement right free from conflicts of interest.  The Court now dismisses the pre-EOD breach of contract claims to that extent for those trusts because it concludes that no such contractual duty exists, yet at the same time the Court holds that plaintiffs have not identified any legal duty independent of the contract with respect to their conflict of interest claims.  Of course, duplicative tort claims do not survive simply because, at the same procedural stage, we have rejected the contractual claims.  The tort claim can survive, however, and is not duplicative when it is not based upon a contractual duty.

The fact that the tort and contract claims both allege diminishment of trust assets does not, standing alone, render those claims duplicative.  Although the similarity of the damages is one factor that may be considered to determine whether tort claims are duplicative of contract claims (*see Dormitory Auth.*, 30 NY3d at 712-713), the plaintiff's primary obligation remains to identify "a legal duty independent of the contract itself" that has been violated (*see id*. at 711 [internal quotation marks omitted]).  I agree with the Appellate Division that if both contractual breaches and extracontractual breaches of tort

duties caused the trusts assets to diminish, there is no reason that plaintiffs should be prevented from fully recovering their damages (*see* 208 AD3d at 431).

Although plaintiffs may not ultimately succeed after discovery in proving that defendants breached legal duties independent of their contractual duties, the complaint has sufficiently pleaded at this stage of the litigation that those independent legal duties existed.

Order insofar as appealed from modified, without costs, in accordance with the opinion herein, as so modified, affirmed, and certified question answered in the negative. Opinion by Judge Garcia. Judges Rivera, Singas and Cannataro concur. Chief Judge Wilson dissents in part in an opinion. Judge Troutman dissents in part in a separate opinion. Judge Halligan took no part.

Decided June 15, 2023